**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CARIBE BILLIE, ET AL. | : | |
| Plaintiffs, | : | CIVIL CASE NO. |
| | : | 3:19-CV-00092 (JCH) |
| v. | : | |
| | : | |
| COVERALL NORTH AMERICA | : | |
| Defendants. | : | MARCH 16, 2022 |

**RULING ON PLAINTIFFS' MOTION TO LIFT THE STAY (DOC. NO. 54)**

**I.      INTRODUCTION**

Plaintiffs Caribe Billie ("Billie") and Quincy Reeves ("Reeves") bring this action against the defendant, commercial cleaning services provider Coverall North America, Inc., ("Coverall"), alleging that Coverall misclassified them as independent contractors and withheld portions of their wages under section 31-71e of the Connecticut General Statutes.  By a Ruling dated March 12, 2020, this court stayed the plaintiffs' action and compelled arbitration. See Ruling (Doc. No. 51). Now before this court is the plaintiffs' Motion to Lift the Stay (Doc. No. 54).  For the reasons stated below, the plaintiffs' Motion is granted in part.

**II.     BACKGROUND**

The plaintiffs, janitorial workers who entered into "franchise agreements" with Coverall, filed this case as a putative class action in January 2019.  See Compl. (Doc. No.  1).  In their Complaint, the plaintiffs contended that Coverall wrongfully classified

them as independent contractors rather than employees and denied them wages owed under Connecticut law.[1]

Coverall moved to dismiss the plaintiffs' claims or to compel arbitration on the basis of arbitration agreements in the plaintiffs' Franchise Agreements and subsequent releases and amendments (collectively, "Agreements").  See Coverall Mot. to Dismiss or Compel (Doc. No. 25).[2]  In opposition, the plaintiffs objected on a number of grounds, including the enforceability of cost-splitting provisions in the Agreements.  See Billie v. Coverall N. Am., Inc., 444 F. Supp. 3d 332, 349 (D. Conn. 2020) (hereinafter "Billie I") (docketed as Ruling (Doc. No. 51)). The provisions, which the plaintiffs argued were unconscionable, required that the plaintiffs pay all arbitration filing fees while the parties split the remaining costs.  Id.  At oral argument, counsel for Coverall represented that his client would not seek to enforce some of the cost splitting measures, including an attorneys' fee provisions in Reeves' Agreement.  See id. at 351 n. 7.  In March 2020, this court granted Coverall's Motion to Compel Arbitration.  See id. at 355.  In its Ruling, the court held that the plaintiffs "failed to meet their burden of establishing substantive unconscionability as to the cost-sharing provision." Billie I, 444 F. Supp. 3d at 351.

After the court's Ruling, Billie and Reeves, as well as a third individual, Veronica Flores, separately filed claims against Coverall before the American Arbitration

_____

[1] The court provided a more detailed overview of the Agreements between the plaintiffs and Coverall in its March 12, 2020 Ruling on the defendant's Motion to Compel Arbitration. See Ruling (Doc. No. 51); Billie v. Coverall N. Am., Inc., 444 F. Supp. 3d 332, 347 (D. Conn. 2020).

[2] In addition to his Franchise Agreement, Billie entered into a Transfer Agreement and signed an Amendment and a guarantee including arbitration clauses. See Billie Transfer Agreement (Doc. No. 27-2); CNC Amendment (Doc. No. 27-3); Billie Guarantee (Doc. No. 27-4).  Reeves similarly entered into a Transfer Agreement as well as a Guarantee and General Release of Claims. See (Doc. Nos. 27-6, 27-7, 27-8). Each agreement contained an arbitration clause.

Association ("AAA").   See Pls.' Mem. in Support of Mot. to Lift the Stay at 1 (Doc. No. 54-1) ("Pls.' Mem.").   The three arbitrations proceeded as follows.

A.    Billie

Billie's Arbitrator found that the cost-splitting provision in his Agreement was unenforceable, ordering Coverall to pay the costs of arbitration.   See Pls.' Mem. at 1 n. 1.  Billie's arbitration is ongoing, but any decision issued in his arbitration will have no preclusive effect on those of Reeves or Flores.  See Billie Agreement at ¶ 21(A)(11) (Doc. No. 27-1) ("A decision by the arbitrator . . . against either Coverall or Franchisee shall be confidential . . . and may not be used collaterally against either of them in existing or subsequent litigation or arbitration . . . .").

B.    Flores

Flores, who is not a named plaintiff in this case,[3] was ordered to make a $2,500 deposit before the Arbitrator would consider the enforceability of the cost-splitting provision in her Agreement.  See Liss-Riordan Decl. at Exs. B, I.  Because Flores was unable to pay the required deposit, the Arbitrator informed her that he would close her case within 30 days of January 21, 2021.   See id at Ex. B.   Her arbitration has since been closed.  See Pls.' Mem. at 7.

C.    Reeves

At the outset of Reeves' arbitration, Reeves and Coverall sparred over which set of procedural rules would govern the dispute: the AAA Employment Arbitration Rules or the AAA Commercial Arbitration Rules.  Under the Employment Arbitration Rules, the

---

[3] Although Billie and Reeves are the named plaintiffs in the case before this court, the plaintiffs' Motion to Lift the Stay and their accompanying Memorandum urge the court to "allow Reeves and Flores to proceed on their . . . claims in court . . . ." See Pls.' Mem. at 2 (emphasis added).  As the court discusses following, see pp. 8-9, infra, Flores is not a plaintiff in this matter.

filing fee for individuals is capped at $300, and all expenses are borne by the employer. <u>See</u> Employment/Workplace Fee Schedule ("Employment Fee Schedule"), available at: https://www.adr.org/employment.  By contrast, under the Commercial Arbitration Rules, the claimant bears the filing fee, which begins at a minimum of $925, while the parties split the remaining costs.  <u>See</u> Commercial Arbitration Rules and Mediation Procedures Administrative Fee Schedules ("Commercial Fee Schedule"), available at: http://info.adr.org/feeschedule/.

Initially, the AAA indicated that it would apply the Employment Fee Schedule, holding the employer or company responsible for arbitrator compensation.  <u>See</u> Liss-Riordan Decl. at Ex. A.  Coverall objected to the use of the Employment Fee Schedule, and the AAA reversed itself and decided to apply the Commercial Fee Schedule and Rules.  <u>Id.</u>  Under Rule 53 of the Commercial Rules, Reeves was obligated to pay the filing fee, while Rule 54 mandated that the two parties split most remaining expenses equally.  <u>See</u> American Arbitration Association Commercial Arbitration Rules and Mediation Procedures ("Commercial Rules").[4]

Following the AAA's decision to apply the Commercial Rules, Reeves applied for and the AAA awarded a Financial Hardship Fee Waiver.  <u>See</u> Liss-Riordan Decl. at Ex. A.  However, while the waiver mitigated some of the costs of arbitration, it did "not affect

---

[4] The defendants submitted an excerpt of the AAA Commercial Rules. <u>See</u> Kurtz Decl. at Ex. D. The court takes judicial notice of the entirety of the Commercial Rules. <u>See</u> <u>Klein v. ATP Flight School, LLP</u>, No. 14-CV-1522, 2014 WL 3013294, at *10 n.6 (E.D.N.Y. July 3, 2014) (noting that a court may take judicial notice of the AAA Rules "on the theory that the AAA Rules are incorporated by reference in the arbitration agreement at issue, or that the AAA Rules are 'a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned'") (quoting Fed. R. Evid. 201(b)(2)).

any obligation to pay arbitrator compensation", leaving Reeves responsible for half of the arbitrator's fees.  Id.

Once an Arbitrator had been assigned to his case, Reeves again challenged the application of the Commercial Rules, arguing that the Employment Fee Schedule should govern his dispute.  See id. at Ex. F.  Both parties briefed the issue of cost-sharing.  See id. at ¶ 4.  Reeves submitted a financial affidavit attesting that he was struggling financially due to the pandemic and would not be able to afford thousands of dollars in arbitrator expenses.  See Kurtz Decl. at Ex. A ¶¶ 5-6.  He attached his fee waiver application, on which he listed $1,861 of gross pay or wages, $1,130.74 of post-tax monthly take-home pay, unemployment insurance of $568 per week, and $15,578 in self-employment income through auto sales from the year prior.  Id. at Ex. A.  He also noted that his wife makes approximately $36,000 per year as a medical assistant, and he reported $12,446.67 in cash or checking accounts.  Id.  He noted that his adult son had been laid off from his part time job and was living at home.

The Arbitrator denied Reeves' Motion on December 8, 2020, determining that Reeves had not provided sufficient evidence to show that he was unable to pay, that the cost sharing provision was unconscionable, or that the Employment Rules rather than the Commercial Rules should apply to the arbitration.  See Liss-Riordan Decl. at Ex. F. Thus, the Commercial Rules continued to govern Reeves' arbitration, requiring him to pay one-half of the Arbitrator's fees.  Id.

Soon thereafter, Reeves was billed $3,937.50 for his share of the arbitrator's fees.  See id. at Ex. G.  AAA contacted both Reeves and Coverall on December 4, 2020, to report that it had not received the $3,937.50 deposit from Reeves or a

$2,562.50 deposit from Coverall to cover the Arbitrator's compensation.  Id.  Six days

later, Reeves' counsel emailed Coverall's counsel and the AAA, stating that Reeves

could "not afford the arbitrator fees for this arbitration so he [would] not be continuing

the arbitration." See Kurtz Decl. at Ex. B.  The case was terminated without a decision

on the merits on January 6, 2021.  See Liss-Riordan Decl. at Ex. H.

 In connection with the present Motion to Lift the Stay, Reeves has submitted a

new Affidavit to this court detailing household finances for himself, his wife, and his two

children.  See Reeves Aff. (Doc. No. 56).  Reeves reports earning around $1,700-1,800

per month from Coverall, although many of his accounts were suspended due to the

COVID-19 pandemic.  Id. at ¶¶ 4-5, Ex. A.  During the pandemic, he received

unemployment benefits of $586 per week through July 2020.  Id. at ¶ 6.  His wife earns

approximately $36,000 per year as a medical assistant, and she also owns an auto

repair business, which Reeves reports operated at a loss in 2019 and 2020.  Id. at ¶¶ 8-

10, Ex. B.  Reeves and his wife hold a joint bank account which has a balance of

around $11,000.  In addition, he holds a personal bank account with a balance of

around $1,000, and his wife holds an account with approximately $3,110.13.  Id. at ¶ 11.

The only other assets that Reeves reports are $1,962.64 in stocks.  Id. at ¶ 12.  His wife

holds a retirement account totaling $6,240.10.  Id.

 Reeves' new Affidavit also reports his expenses, including monthly expenses of

$1,050 for rent, $100 for internet, $125 for car insurance, and $500-600 for family

groceries.  Id. at ¶¶ 13-16.  Furthermore, Reeves owes approximately $5,000 in debt.

Id. at ¶ 17.  Thus, Reeves reports a net worth of approximately $8,963, aggregating his

individual bank account, his shared bank account, and his stocks, subtracting his debt,

and excluding his wife's bank account or retirement savings.  His family's monthly expenses appear to roughly match Reeves' monthly income.

### III.   LEGAL STANDARD

#### A.   Standing

Article III, § 2 of the Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" Lujan v. Defenders of Wildlife, 504 U.S. 555, 559.  Constitutional standing developed "to ensure that federal courts do not exceed their authority as it has been traditionally understood" by limiting "the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016).  In addition to constitutional standing, courts have adopted prudential standing doctrines that further limit the exercise of federal jurisdiction.  To satisfy prudential standing, a "plaintiff generally must assert [its] own legal rights and interests, and cannot rest [its] claim to relief on the rights or interests of third parties." Warth v. Seldin, 422 U.S. 490, 499 (1975); see also Am. Psychiatric Ass'n v. Anthem Health Plans, Inc., 821 F.3d 352, 358 (2d Cir. 2016).

#### B.   Federal Arbitration Act

Under the Federal Arbitration Act ("FAA"), a district court must stay judicial proceedings when the parties have agreed to arbitrate the issues and one party has applied for a stay.  See 9 U.S.C. § 3; see also Katz v. Cellco P'ship, 794 F.3d 341, 345 (2d Cir. 2015).  Such a stay remains in place "until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not

in default in proceeding with such arbitration." 9 U.S.C. § 3.[5]  In the event of one party's

"failure, neglect, or refusal" to arbitrate, the court must compel arbitration.  9 U.S.C. § 4.

Because the FAA reflects federal policy favoring arbitration, "any doubts concerning the

scope of arbitrable issues should be resolved in favor of arbitration." Moses H. Cone

Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25 (1983).

## IV.  DISCUSSION

### A.  Jurisdiction Over Flores' Claims

As a threshold matter, this court lacks jurisdiction over claims asserted by or on

behalf of Flores, because she is not a party to this action.  See, e.g., Steinmetz v.

Danbury Visiting Nurse Ass'n, No. 3:19-CV-01819 (JCH), 2021 WL 4193070, at *5-6

(D.Conn. Sept. 15, 2021) (explaining that, because a non-party lacks standing to move

for relief, the court lacks jurisdiction to rule on a motion filed by a non-party).  Further,

while this matter was pled as a potential class action, the court has not certified a class,

because the court terminated the plaintiffs' Motion for Class Certification as moot in light

of its Ruling compelling arbitration.  See Order (Doc. No. 52) Terminating as Moot

Motion to Certify Class (Doc. No. 29).  Thus, Flores has no standing as a class member,

and Reeves lacks standing to assert claims on her behalf.  See, e.g., Am. Psychiatric

---

[5] Section 3 of the FAA provides in full:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphasis added).

Ass'n, 821 F.3d at 358 ("a plaintiff may ordinarily assert only his own legal rights, not those of third parties" unless he acts as a "next friend").  While the court recognizes the "chicken and egg" problem that emerges for the plaintiffs—whereby they cannot move to add Ms. Flores as a party with the stay in place, but cannot use Ms. Flores' experience to advocate for lifting the stay unless she is a party—the court cannot adjudicate the rights of a person not a party to this action.

B.      Reeves' Motion to Lift the Stay (Doc. No. 54)

Reeves' arguments in support of lifting the stay fall into two broad categories. First, he asks the court to, in effect, reconsider whether the cost-splitting provision in his Agreement with Coverall is unconscionable and unenforceable.  See Pls.' Mem. at 13-17.  Second, he contends that Section 3 of the FAA no longer requires the court to stay this action because (a) the arbitration has been "had" because Reeves was genuinely unable to pay the high fees, and (b) Coverall has waived its right to arbitrate.  See id. at 21-26.

Coverall objects, arguing first that the court has already decided that the terms of Reeves' arbitration agreement delegate questions of arbitrability to the arbitrator and that the delegation clause in Reeves' arbitration agreement is not unconscionable.  See Def.'s Opp'n at 9-16.  In response to Reeves' second assertion, that the court should not maintain the stay under Section 3, Coverall argues that (a) Reeves has failed to make good-faith attempts to arbitrate or provide evidence of his inability to pay; and (b) Coverall has not prevented Reeves from arbitrating.  See id. at 6-9.

1.      Reconsidering the Unconscionability of Cost-Splitting Provision

This court will not rule on the unconscionability of the cost-splitting provision, as this issue has already been addressed twice: once by this court, see Billie v. Coverall N.

Am., Inc. (Billie I), 444 F. Supp. 3d 332, 349-353 (D. Conn. 2020), and once in arbitration.  See Reeves Arbitration Order (Doc. No. 55-6).

As to this court's decision in Billie I, "[t]he standard for granting a motion for reconsideration is strict." Ricciuti v. Gyzenis, 832 F. Supp. 2d 147, 165 (D. Conn. 2011) (citing Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)); see also D. Conn. Civ. R. 7(c)(1) ("Motions for reconsideration shall not be routinely filed and shall satisfy the strict standard applicable to such motions.").  The three primary grounds for reconsideration are "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992) (internal quotation marks and citations omitted).  The court should only grant reconsideration "when the 'moving party can point to controlling decisions or data that the court overlooked' and 'that might reasonably be expected to alter the conclusion reached by the court.'" Doe v. Winchester Bd. of Educ., No. 10-CV-1179, 2017 WL 662898, at *2 (D. Conn. Feb. 17, 2017) (citing Shrader, 70 F.3d at 256–57).  Additionally, "[a] motion for reconsideration is not a means to reargue those issues already considered when a party does not like the way the original motion was resolved." Id. (citing Pierce v. Lee, No. 3:08-CV-1721 (VLB), 2010 WL 4683911, at *1 (D. Conn. Nov. 4, 2010)), nor is it a "vehicle for the introduction of new evidence that could have been presented to the court prior to the decision of which reconsideration is sought." Jones v. Carolina Freight Carriers Corp., 152 F.3d 918, at *1 (2d Cir. 1998) (summary order).

In Billie I, this court considered the unconscionability of the cost-splitting provision as applied to the Agreement's delegation clause and determined that Reeves

10

"failed to demonstrate that the cost-sharing provision is substantively unconscionable under Connecticut law." Billie I, 444 F. Supp. 3d at 353.  The court qualified its decision, however, noting that the record lacked information "regarding the size of the plaintiffs' claim against CNA, the fees plausibly expected, and the plaintiffs' financial situation." Id.  Reeves has now introduced more comprehensive evidence of his financial hardship, including previously unavailable information about the high costs of arbitration and new economic duress brought on by the COVID-19 pandemic. See Reeves Aff.  However, as the court held in Billie I, the arbitrator, not the court, has the authority to determine the general question of the unconscionability of cost splitting where, as here, the parties have agreed to arbitrate gateway questions of arbitrability.  See Billie I, 444 F.Supp.3d at 346 (declining to address arguments that did not challenge the enforceability of the delegation clause, specifically); see also Dhue v. O'Reilly, No. 18 CIV. 2547 (DAB), 2018 WL 11222900 at *5 n.3 (S.D.N.Y. Oct. 10, 2018) ("Having already decided that the question . . . must be delegated to the arbitrator . . . this Court lacks the authority to engage in an analysis that substantially overlaps with and decides the very issue left to the arbitrator . . . .").[6]

Not only has the court determined that an arbitrator must decide the unconscionability of cost splitting, but the Arbitrator has issued an Order deciding exactly the issue in question.  See Reeves Arbitration Order.  The Arbitrator determined

---

[6] While the court does not reconsider its prior Ruling or the Arbitrator's Order regarding unconscionability, the court discusses the cost of arbitration and Reeves' ability to pay in Section IV(B)(2) of this Ruling in determining whether the arbitration "has been had."  See pp. 22-24, infra.  The court notes that the questions of the unconscionability of the cost-splitting provision and whether the arbitration "has been had" are interrelated, as both depend, in part, on the costs of arbitration and Reeves' financial circumstances.

that the AAA Commercial Rules would apply to the parties' Arbitration, and that Reeves had failed to show that requiring him to bear half of the costs would render the cost-splitting arrangement substantively unconscionable.  See id.  This court's review of an Arbitrator's decision is limited to the narrowest of circumstances.  Generally, the court gives great weight  to an arbitrator's application of the procedural rules of the arbitral tribunal, as "arbitrators, comparatively more expert about their own rule's meaning, are comparatively better able to interpret and to apply it."  Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002) (explaining that "'procedural' questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator, to decide"); see also Tempo Shain Corp. v. Bertek, Inc., 120 F.3d 16, 20 (2d Cir. 1997) ("Federal courts do not superintend arbitration proceedings. Our review is restricted to determining whether the procedure was fundamentally unfair.") (citation omitted); see also Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Zaro Bake Shop, Inc., No. 20-CV-9894 (LJL), 2021 WL 2350094, at *14 (S.D.N.Y. June 8, 2021) (collecting cases).  A court will only vacate an arbitrator's procedural ruling "if the ruling denied the petitioner 'fundamental fairness'", and the arbitrator failed to "give each of the parties to a dispute an adequate opportunity to present its evidence and argument." Landmark Ventures, Inc. v. InSightec, Ltd., 63 F. Supp. 3d 343, 352 (S.D.N.Y. 2014), aff'd, 619 F. App'x 37 (2d Cir. 2015) (quotation omitted); Tempo Shain Corp., 120 F.3d at 20 (same, but not limiting fundamental fairness review to procedural rulings).

In his Order, the Arbitrator determined that the AAA Commercial Rules applied to Mr. Reeves' arbitration and the cost-sharing provision was not substantively

unconscionable.  See Reeves Arbitration Order.  Under the deferential standard of review applicable to arbitration proceedings, the court cannot determine that the Arbitrator reached his decision through a fundamentally unfair process.  Reeves briefed the cost-splitting issue in a Motion to Apply the AAA Employment Rules.  See Liss Riordan Decl. at ¶ 4; see also Reeves Aff. in Support of Motion to Apply the AAA Employment Rules (Doc. No. 61-1).  Reeves concedes that, in connection with that Motion, he had the opportunity to present evidence of his inability to pay.  See Pls.' Reply at 3 n. 2 ("Reeves did provide evidence of an inability to pay – in the form of a sworn statement, attaching the AAA form which had been accepted by the AAA itself as sufficient evidence of his inability to afford half the costs of arbitration").  Upon review of Mr. Reeves' Motion, the Arbitrator determined that Reeves did not meet his burden to show that the cost sharing provision was substantively unconscionable.  See Reeves Arbitration Order ("Mr. Reeves failed to meet his burden on the claim of substantive unconscionability due to the cost sharing provision . . . Mr. Reeves claims, without supporting evidence, that bearing one-half of the costs of the arbitrator's fees would make it prohibitively expensive . . . . He provides no support for . . . [his] statement [that arbitration will cost tens of thousands of dollars].").  The Arbitrator's decision that the fee sharing arrangement is not unconscionable bars this court from reaching an alternative conclusion.  To do so would be to overstep the deference that courts grant to arbitral decisions.  Thus, this court cannot reconsider the issue of unconscionability, which was submitted to and determined by the Arbitrator.

   2. Section 3 of the FAA

  Reeves also contends that the court should lift the stay pursuant to Section 3 of the FAA.

Generally, the FAA reflects a "strong federal policy favoring arbitration as an alternative means of dispute resolution." Ross v. American Express Co., 547 F.3d 137, 142 (2d Cir. 2008).  Nonetheless, courts in several circuits have "mapped out a path, albeit narrow", to lifting a stay and permitting parties to return to court from arbitration. CellInfo, LLC v. Am. Tower Corp., 506 F. Supp. 3d 61, 65 (D. Mass. 2020).  When the district court stays litigation pending arbitration, Section 3 mandates that the stay remain in place until: (1) "such arbitration has been had in accordance with the terms of the agreement"; or (2) "the applicant for the stay is . . . in default in proceeding with such arbitration." 9 U.S.C. § 3.  Thus, if arbitration "has been had" or the stay applicant has failed to proceed with arbitration, the court may lift the stay.

In the instant case, Reeves argues that his arbitration "has been had" and Coverall is in default, justifying lifting the stay.

        a.     Whether the Arbitration "Has Been Had in Accordance with the Agreement"

Reeves contends that this court can and should lift the stay because the arbitration "has been had" for the purposes of Section 3.  See Pls.' Mem. at 21.

Courts have found that an arbitration "'has been had' in accordance with  the terms of the agreement" when arbitral proceedings began according to the rules in the parties' agreements before being terminated for a party's failure to pay, even if no final award issued.  See Cota v. Art Brand Studios, LLC, No. 21-CV-1519 (LJL), 2021 WL 4864588, at *11-12 (S.D.N.Y. Oct. 15, 2021) (determining an arbitration had been "had" and denying a defendant's motion to compel arbitration when arbitration terminated after one party declined to cover fees owed by the opposing party) (collecting cases); Tillman v. Tillman, 825 F.3d 1069 (9th Cir. 2016) (lifting a stay and finding that

arbitration had been "had" when the parties' agreement incorporated the AAA's rules, one party was unable to pay the requisite fees, and the arbitrator terminated the proceedings pursuant to the AAA's rules); Freeman v. SmartPay Leasing, LLC, 771 F. App'x 926, 935 (11th Cir. 2019) (determining that the district court did not err determining arbitration had been "had" and lifting a stay where "no arbitration award was awarded", but the plaintiff "initiated an arbitration that was terminated by [the Arbitral body] after [the defendant] failed to pay the filing fee" requested by the Arbitral body); cf. CellInfo, LLC v. Am. Tower Corp., 506 F. Supp. 3d 61, 65-67, 72-73 (D.Mass. 2020) (adopting Tillman's reasoning but determining that arbitration had not been "had" and declining to lift a stay where the plaintiff failed to show a good-faith effort to comply with the requirements of the arbitral body).  In each of these cases, courts have held that arbitration may be "had in accordance with the agreement" where two conditions have been met: (a) the arbitration—in conformity with procedures laid out in the relevant agreement and arbitral rules—began, transpired in part, and concluded when one party's failed to pay; and (b) the party who failed to pay did so because of a good-faith, genuine inability to afford the costs of arbitration.

As the court discusses in the following sections, the arbitration between Reeves and Coverall satisfied both of these conditions, as (a) the arbitration followed the terms of his Agreement and the AAA's Commercial Rules; and (b) he made a good-faith effort to arbitrate before facing costs that he has shown he could not afford.

i.   "In Accordance with the Agreement"

The decisions of several courts considering when arbitration "has been had" for the purposes of Section 3 of the FAA demonstrate that Reeves' arbitration, though cut short by his inability to pay, took place in accordance with his Agreement with Coverall.

In <u>Tillman</u>, the case upon which Reeves relies most heavily, the district court granted the defendant law firm's motion compelling the individual plaintiff to arbitrate. <u>Tillman</u>, 825 F.3d at 1072-73.  Although the plaintiff arbitrated the initial stages of the dispute, she eventually ran out of funds and notified the AAA of her inability to pay.  <u>Id.</u> at 1072.  The AAA "inquir[ed] as to whether [the firm was] willing to cover th[e] deposit", but the firm declined.  <u>Id.</u>  When the deposit was not submitted, the arbitrator terminated arbitration.  <u>Id.</u> at 1072-74.  The plaintiff returned to the district court, where the judge lifted the stay.  <u>Id</u>. at 1074-75.  The Ninth Circuit upheld the district court's decision, clarifying that lifting the stay was appropriate because the arbitration "had been had in accordance with the terms of the agreement" as the plaintiff had not "fail[ed], neglect[ed], or refus[ed]" to arbitrate.  <u>See id.</u> at 1073-76.

The Ninth Circuit determined that arbitration "had been had" in <u>Tillman</u> where the arbitration agreement incorporated the rules of the AAA, which allow for a termination of proceedings upon non-payment of fees.  <u>See</u> 825 F.3d at 1074.  As the <u>Tillman</u> court explained the "agreement between [the plaintiff] and [the defendant] firm explicitly incorporated the AAA's rules", and the arbitration proceeded and was terminated in accordance with those rules:

> "Rule R-53 allows the AAA to prescribe fees and gives it the sole discretion to reduce fees in the event of hardship . . . . Rule R-56 allows the AAA to require the parties to pay deposits in advance in "such sums of money as it deems necessary." . . . . Rule R-57 states that in the event of nonpayment, the arbitrator . . . "may order the suspension of the arbitration." . . . . If such suspension has occurred and the parties still fail to make full deposits within a designated time period, the arbitrator "may terminate the proceedings."

825 F.3d at 1074.  Because "[a]ll these steps were followed . . . including terminating the proceedings without issuance of an award", the Ninth Circuit determined that

"arbitration had 'been had' pursuant to the agreement between the firm and [the plaintiff], the district properly lifted the stay." See also Pre–Paid Legal Services, Inc. v. Cahill, 786 F.3d 1287, 1293–94 (10th Cir. 2015).

A district court in this Circuit recently adopted similar reasoning to that of the Tillman court, concluding that arbitration has been "had" in accordance with the parties' agreements when: (1) the agreements "required the parties to submit their dispute to arbitration before the AAA 'in accordance with the rules of the American Arbitration Association then in effect'", but did not specify who was to pay the fees; (2) "Rule R-57 of the AAA then in effect provided that if the fees 'have not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment.'"; (3) The AAA informed the parties that one party could make a payment on behalf of the non-paying party to avoid interrupting the proceeding; (4) Neither party made the required payment; and (5) the arbitration was terminated. See Cota, 2021 WL 4864588, at *11-12 (denying the defendant's Motion to Compel Arbitration because arbitration had been "had").

Here, as in Tillman and Cota, the Agreement between Reeves and Coverall required the parties to arbitrate before the AAA under the Association's Commercial Rules. See Reeves Agreement at ¶ 21(a). Reeves' Agreement also provided that the "costs of arbitration shall be shared equally between the Parties . . . .", and that "[e]ither party, in their sole and exclusive discretion, may choose to assume responsibility for the other Party's arbitration costs." See Reeves Release at § 4(d). Under the AAA Rules applicable to Reeves and Coverall's Arbitration, Rule 53 allows the AAA to "defer or reduce administrative fees" "in the event of extreme hardship."  Rule 56(a) allows the

AAA to require the parties to deposit sums "as it deems necessary . . . including the arbitrator's fee . . . ." See AAA Commercial Rules.  If such charges are not paid in full, Rule 57 permits the AAA to "inform the parties" so that "one of them may advance the required payment."  Id.  In the event that fees are not paid, the arbitrator may terminate the arbitration.  Id.

Like the proceedings in Tillman and Cota, Reeves' arbitration began pursuant to his Agreement with Coverall and the AAA Rules incorporated therein.  Reeves applied for and was granted a hardship waiver under Rule 53 of the Commercial Rules.  See Liss-Riordan Decl. at Ex. A.  He then challenged the application of the Commercial Rules but continued participating in the arbitration by submitting briefing, responding to discovery requests, and meeting and conferring.  See Liss-Riordan Decl. at ¶ 4.  The Arbitrator denied his request to reapportion the fees or invalidate the cost-splitting provision in his Agreement, then billed Reeves $3,937.50 as permitted by Rule 56(a).  See id. at Ex. G.  When neither Reeves nor Coverall paid the requisite fees, the AAA notified both parties of the deficiencies.  See id.  Keeping with his consistent assertions that he was unable to afford high arbitral fees, Reeves notified Coverall's Counsel and the AAA of his inability to pay the deposit.  See Kurtz Decl. at Ex. B.  Coverall did not advance the payment, although both Commercial Rule 57 and the terms of Reeves' Agreement allow for one party to cover the other's costs.  See AAA Commercial Rules; Reeves Release at § 4(c).  Without the requisite payment, the Arbitrator terminated the case as permitted by Rule 57.  See Liss-Riordan Decl. at Ex. H.

Because the Arbitration between Reeves and Coverall commenced and concluded in accordance with the terms of their Agreement, which incorporated the

Commercial Rules of the AAA, the Arbitration "has been had in accordance with the terms of the agreement" as required by Section 3 of the FAA.

           ii.     Whether Reeves' Failure to Pay was In Good Faith

While Reeves' arbitration unfolded in conformity with the terms of his Agreement and AAA's rules, he must also show that he made a good-faith attempt to arbitrate.

As the Tillman court and others to consider the issue have made clear, a party may not manipulate its way back into court by withholding payments despite its ability to pay. In Tillman, the Ninth Circuit determined that both Sections 3 and 4[7] of the FAA bar the district court from providing relief to a party who chooses not to pay for arbitration. In such a situation, "the district court probably could . . . compel arbitration under the FAA's provision allowing such an order in the event of a party's 'failure, neglect, or refusal' to arbitrate." See Tillman, 825 F.3d at 1075–76 (quoting 9 U.S.C. § 4.). As the Tillman court elaborated:

> A question may arise in such circumstances as to whether an arbitration "has been had in accordance with the terms of the agreement," 9 U.S.C. § 3, when it has been terminated due to the nonpayment of a party who has the ability to pay but simply chooses not to. Even if such an arbitration has been terminated in accordance with the rules governing the arbitration, as Tillman's arbitration was here, it may be contrary to "the structure and purpose of the FAA" to allow a party to an arbitration agreement to benefit from their intentional noncompliance with an arbitrator's rules. Sink v. Aden

---

[7] Section 4 of the FAA provides in relevant part:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement. . . . The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement . . . .

9 U.S.C. § 4.

> Enters., 352 F.3d 1197, 1200 (9th Cir. 2003). But because Tillman was unable to pay, gave notice of her inability to pay during arbitration, and "made genuine efforts to make alternate payment arrangements," id. at 1199, we need not decide how to construe 9 U.S.C. §§ 3 and 4 in the event of a party's willful nonpayment of an arbitrator's fees.

Tillman, 825 F.3d at 1076 n. 1; see also Cellinfo, 506 F.Supp.3d at 66-67 (collecting cases supporting the lifting of a stay only upon a "satisfactory showing that the non-paying party acted in good faith and under a genuine indigency"); Pre-Paid Legal Servs., Inc. v. Cahill, 786 F.3d 1287, 1294 (10th Cir. 2015) (declining to grant a party's motion to maintain a stay under Section 3 after he failed to pay arbitration fees but did not "show he was unable to afford payment, ask the arbitrators to modify his payment schedule, or move for an order requiring [the defendant] to pay his share for him so that arbitration could continue."); but see Cota, 2021 WL 4864588, at *11-12 (determining that arbitration had "been had" without considering whether the non-paying party made good faith efforts to arbitrate or showed a genuine inability to pay). As the CellInfo court elaborates, "a party should do more than simply show empty pockets. Rather, it must show that it diligently arbitrated, that it sought alternative funds but failed, that it attempted to adjust payment, get a discount or delay from the AAA, that it did not drag foot without action, that it made reasonable efforts to arbitrate in good faith." 506 F.Supp.3d at 61; see also Pre-Paid Legal Servs., Inc., 786 F.3d at 1294.

Here, Reeves has shown more than "empty pockets." First, he has offered evidence that he lacks the resources to pay for arbitration.[8] By this court's accounting based on Reeves' Affidavit, the $3,937.50 charge for arbitrators' fees would have

---

[8] One court in this Circuit recently determined that arbitration had "been had" without considering evidence of the non-paying parties' ability to pay. See Cota, 2021 WL 4864588, at *11-12.

drained approximately forty-four percent of Reeves' $8,963 net worth.  See pp. 5-6,

infra.[9]  Further, he was asked to make this payment at a time when his income from his

janitorial work for Coverall had decreased due to the COVID-19 pandemic.  See Reeves

Aff. at ¶¶ 4,7.  During the same period, he qualified for Unemployment Insurance

benefits because several of his cleaning accounts were cancelled.  See Reeves

Hardship Waiver Application (Doc. No. 61-1).  The AAA itself found that Reeves did not

have sufficient financial means to pay their administrative fees.  AAA Email Granting

Hardship Waiver (Doc. No. 55-1 at 2).[10]  Finally, there is no indication that Reeves'

financial status was indicative of an attempt to hide assets or act in bad faith.[11]

---

[9] The parties dispute whether this $3,937.50 charge would have represented the entirety of the Arbitrator's fees for the full arbitration, or whether the charge was merely the fee for the Arbitrator's time spent scheduling proceedings and deciding the threshold fee-splitting question. See Reeves Mem. in Support of Mot. at 16-17 (contending that the costs of the overall proceeding would have been higher); Coverall Opp'n at 14-15 (arguing that the $3,937.50 charge represented the anticipated arbitrator fees for the entire arbitration). The record is not clear as to whether the arbitrator would have sought additional compensation had the proceedings continued.  However, the court's analysis in the following pages applies even if the $3,937.50 charge would have represented the entire cost Reeves would have needed to incur to arbitrate.

[10] While the Arbitrator, citing this court, found that Reeves "failed to meet his burden on the claim of substantive unconscionability due to the cost sharing provision", see Reeves Arbitration Order, the present question is not one of the substantive unconscionability of the Agreement, but one of Reeves' ability to pay and his good faith in attempting to secure payments. See, e.g., Tillman v. Tillman, No. CV 09-2017-VAP (RCX), 2013 WL 12113443, at *3 (C.D. Cal. July 12, 2013), aff'd, 825 F.3d 1069 (9th Cir. 2016) (finding that the plaintiff lacked the resources to deposit the arbitration fee without discussing unconscionability).

[11] The court is wary of the potential for parties to arbitration to abuse the "good faith" standard by seeking to avoid arbitration obligations by deceptively declining to disclose assets. Here, Reeves, a janitorial worker, has obtained a hardship waiver, accepted Unemployment Insurance benefits, and submitted a financial affidavit.  No countervailing evidence indicates that he has fabricated his financial status to avoid arbitrating the dispute.

For the sake of comparison, in Tillman, the plaintiff received $3,073,555.35 in a jury award, putting aside $150,000 each for two of her daughters and $150,000 for a third individual. See Declaration of Renee Tillman, Tillman v. Tillman, CV-09-02017-VAP (Doc. No. 280-1). After paying off her bills and mortgage, she held $2,500,000, which she invested. Id. She then gifted her husband $225,000 and lost $525,000 in penalties, fees, and bad investments. Id. She bought four vehicles for her family for $70,000, paid off her stepmother's car, and helped family members with bills. Id. She paid for $75,000 of improvements to her property, spent $10,000 on dental work, and donated $10,000 to local charities. Id. However, the remainder of her funds dried up when she incurred legal fees to defend a lawsuit and paid

Indeed Reeves' financial circumstances are comparable to those of plaintiffs in cases in which courts have struck down arbitration agreements because of prohibitive arbitration costs.  While, on the incomplete record before this court in Billie I, the court noted that "[e]ach of these cases[, including Andresen v. IntePros Federal, Inc, Haro v. NCR Corporation, and Shankle v. B-G Maint. Mgmt. of Colorado, Inc.,] involved more complete records and higher fees than the record and fees in this case", the present more developed record evidences that Reeves faces greater financial hardship than the plaintiffs in some of those cases:

> In Andresen v. IntePros Federal, Inc., the court relied upon "the undisputed $7,500 filing fee" and concluded that, this fee "standing alone, is more than sufficient to demonstrate cost-prohibitiveness when measured against Dr. Andresen's modest financial circumstances." 240 F. Supp. 3d 143, 159 (D.D.C. 2017) [(finding that Dr. Anderson was "earning a monthly income that marginally exceeds her monthly outlays, has some money in savings and retirement accounts, and has a real property asset that—if there is a willing buyer—might offset her debt")]. In Haro v. NCR Corporation, the plaintiff, who alleged wrongful termination, submitted evidence stating he had received an annual salary of $73,713. 2005 WL 8153979, at *5 (S.D. Ohio July 26, 2005). Based upon the size of this claim, the court relied upon one study that found that the arbitration costs for an $80,000 arbitration claim ranged from $4,350 to $11,350. Id. . . . See also Shankle v. B-G Maint. Mgmt. of Colorado, Inc., 163 F.3d 1230, 1234–35 (10th Cir. 1999) (estimating the cost of arbitration to be between $1,875 and $5,000).

Billie I, 444 F. Supp. 3d at 352–53.  As the Andresen court rightly explained, where a plaintiff has to balance expenses and a modest salary, savings, and retirement account,

---

out $13,937.50 in arbitration fees. Id. She lacked the money in her checking account to cover the fees, and she and her husband were living on approximately $1,489 of monthly Social Security disability benefits. Id. She maintained equity in her land, her trailer, and the vehicles she had purchased, but the court determined that she was incapable of paying additional arbitration fees of $18,562.50. Id.

While the record in Tillman indicates that the plaintiff had less cash on hand than Reeves by the time arbitration fees came due, both plaintiffs faced costs beyond their means to pay.  As the court discusses below, see p. 22, infra, it cannot be the case that a "good faith" effort to pay arbitration fees requires a plaintiff to drive himself to the brink of bankruptcy.

"a potential multi-thousand dollar expense is prohibitive." <u>Andresen</u>, 240 F. Supp. 3d at 158–59.  This court agrees and concludes that Reeves has shown that he made reasonable attempts to arbitrate in good faith, notwithstanding his reluctance to spend nearly half of his net worth on arbitration fees.  To "demand that [Reeves] . . . run the risk of depleting [his] savings and dipping into [his] modest retirement funds" is "quite simply, preposterous." <u>See</u> <u>id.</u>[12]

Second, Reeves has exerted diligent efforts to arbitrate, participating in discovery until he received the $3,937.50 charge.  While the steep bill led Reeves to inform Coverall and the AAA that he could no longer proceed in arbitration, he made real attempts to secure funds from the outset of the dispute.  He tried and failed to obtain a more favorable fee arrangement in front of this court and the arbitrator.  He applied for and obtained a hardship fee waiver.  <u>See</u> Reeves Hardship Waiver Application. Throughout the proceedings, he put both Coverall and the AAA on notice of his limited resources.  Reeves did not "fail[ ], neglect, or refus[e]" to arbitrate, <u>see</u> 9 U.S.C. § 4, but rather "gave notice of [his] inability to pay during arbitration" and "made genuine efforts to make alternate payment arrangements." <u>Tillman</u>, 825 F.3d at 1075 n.1; <u>cf. CellInfo</u>,

---

[12] Courts often consider the question of litigants' ability to pay fees in the context of motions to proceed in forma pauperis under section 1915(a) of title 28 of the United States Code.  As the Second Circuit has made clear, a litigant may qualify to have his court filing fees waived without "demonstrat[ing] absolute destitution; no party must be made to choose between abandoning a potentially meritorious claim or foregoing the necessities of life." <u>Potnick v. E. State Hosp.</u>, 701 F.2d 243, 244 (2d Cir. 1983). While filing fees are generally lower in court than before arbitral bodies, courts have granted in forma pauperis status to plaintiffs with financial circumstances comparable to Reeves'.  <u>See, e.g.</u>, <u>Billie v. Deutsche Bank Tr. Co.</u>, No. 3:18CV01176(AWT), 2018 WL 10579837, at *2 (D. Conn. Sept. 14, 2018), <u>report and recommendation adopted</u>, No. 3:18CV1176(AWT), 2018 WL 10579825 (D. Conn. Oct. 24, 2018) (granting in forma pauperis status to a plaintiff with a net income of $3,000 per month, no liquid assets, and two properties with outstanding mortgages in excess of the property value); <u>Rogers v. United States</u>, 248 F. App'x 402, 402–03 (3d Cir. 2007) (granting in forma pauperis status to a plaintiff when "the District Court filing fee was more than half of his monthly income"); <u>Garcia v. Cole</u>, 428 F. Supp. 3d 644, 654 (D.N.M. 2019) (granting in forma pauperis status to a plaintiff with a monthly income of $1,600, average monthly expense of $1,475, no bank account, and a dependent daughter).

506 F. Supp. 3d at 72 (finding a party failed to arbitrate where its "inaction differentiate[d] it from Tillman").

Because Reeves genuinely could not afford the arbitrator's fees, but made diligent efforts to arbitrate in good faith before the arbitration terminated, the arbitration "has been had in accordance with the agreement" under Section 3 of the FAA.

> b.   Whether Coverall Is "In Default In Proceeding" With the Arbitration

In addition to arguing that the arbitration "has been had", Reeves also contends that Coverall waived its right to arbitrate by refusing to advance his fees.  Pls.' Mem.  at 21-26.  He asserts that Coverall was thus "in default in proceeding with [the] arbitration" under Section 3 of the FAA.  See 9 U.S.C. § 3.

Generally, "[t]here is a strong presumption in favor of arbitration, and waiver of the right to arbitration is not to be lightly inferred." Thyssen, Inc. v. Calypso Shipping Corp., S.A., 310 F.3d 102, 104–05 (2d Cir. 2002) (citation and internal alterations omitted).  However, "[a]n inquiry into whether an arbitration right has been waived is factually specific and not susceptible to bright line rules." Id. at 105.  The Second Circuit has equated a waiver of the right to arbitrate with a "default in proceeding with such arbitration" under Section 3 of the FAA.  See, e.g., Doctor's Assocs., Inc. v. Distajo, 66 F.3d 438, 455 (2d Cir. 1995).  Courts in this and other Circuits have determined that an applicant for a stay may default by failing to pay arbitration fees.  See, e.g., Cota, 2021 WL 4864588 at *9 (collecting cases); SmartPay, 771 F. App'x at 932, 935 (determining that a party defaulted and "waived its right to arbitration by failing to pay arbitration fees" under a different arbitral body's Consumer Minimum Standards); Pre-Paid Legal Servs., 786 F.3d at 1294 (10th Cir. 2015) ("Failure to pay arbitration fees constitutes a 'default'

under § 3."). To show waiver on the basis of a refusal to arbitrate "courts in this Circuit have required a showing that the defendant (i) engaged in conduct that is inconsistent with the right to arbitrate that (ii) prejudiced the plaintiff." Stanley v. A Better Way Wholesale Autos, Inc., No. 3:17-CV-01215-MPS, 2018 WL 3872156, at *6 (D.Conn. Aug. 15, 2018) (internal citation omitted).

                    i.    Conduct Inconsistent With the Right to Arbitrate

       Coverall's refusal to advance Reeves' portion of the arbitrator's compensation constituted "conduct inconsistent with the right to arbitrate." Id.

       As the district court held in Cota, a party may engage in "conduct inconsistent with the right to arbitrate" when it refuses to advance another party's fees if such a refusal ends the arbitration. See 2021 WL 4864588 at *9-11. In that case, the defendant, Art Brand, filed a demand for arbitration against the plaintiff artists pursuant to an arbitration agreement. Id. at 9. The plaintiff artists filed twenty-two counterclaims, and Art Brand asked the arbitral panel to dismiss those counterclaims. Id. The panel declined Art Brand's request and issued an order that would terminate the whole arbitration if full payment was not made. Id. That order gave Art Brand the right to pay the fees for both parties if it wanted to continue the arbitration. Id. As the district court reasoned, "[t]hereafter, Art Brand had a choice—it could pay both fees if it wanted to prosecute the claims and take the risk that it might never be able to recover the share of fees owed by the Artists or it could elect not to pay either set of fees and allow the arbitration . . . to terminate." Id. Art Brand chose the latter, knowing that the arbitration would terminate, and thus "acted inconsistently with its arbitration right." Id.

       The Cota court reached this conclusion in spite of the fact that the arbitral panel "never directed or ordered [Art Brand] to advance the full costs of the arbitration." Id. at

10.  "The key factor", the court reasoned, is "whether the party fails to take that action available to it to keep the arbitration alive and thus acts inconsistently with the right to arbitrate, causing prejudice to the other side." Id.  In effect, if a party seeks to compel arbitration, then refuses an opportunity to advance costs to ensure that the arbitration takes place, it acts inconsistently with its contractual arbitration right.

Coverall's refusal to pay Reeves' fees, like that of Art Brand, was "inconsistent with the right to arbitrate." Id.  While neither party has submitted evidence that the AAA requested or ordered that Coverall pay Reeves' expenses, AAA informed both Reeves and Coverall that neither party had paid their requisite deposits.  See Liss-Riordan Decl. at Ex. G.  Both parties, therefore, were aware of the shortfall and the arbitration's possible end if funds were not received.  Id.  ("If the outstanding balance is not brought current . . . The arbitrator may suspend or terminate the case").  Coverall was on notice of the impending termination of the arbitration and of Reeves' claim that he was unable to pay.  In such a situation, both the AAA Rules and Reeves' Agreement provided that Coverall had the opportunity to cover Reeves' costs and continue the arbitration.  See Reeves Release at ¶¶ 4(c) ("either party, in their sole and exclusive discretion, may choose to assume responsibility for the other Party's arbitration costs") & 4(h) ("the prevailing party shall be entitled to reimbursement by the other Party of all litigation and arbitration costs, including attorneys' fees."); see also AAA Commercial Rule 57 ("If arbitrator compensation . . . [has] not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment").

Coverall could have advanced Reeves' fees under Commercial Rule 57; indeed, it concedes that it has previously paid claimants' arbitrator fees.  See Jamie Kurtz Decl.

at Ex. C.  Furthermore, Coverall was aware of Reeves claim that he could not afford the arbitrator's fees.  Reeves had requested the application of the lower-fee Employment Fee Schedule from the outset of the dispute, as Coverall acknowledged at oral argument before this court.  <u>See</u> Oral Argument Transcript (Doc. No. 53). Furthermore, during oral argument, counsel for Coverall made representations that Coverall would be willing to pay Reeves' fees:

> THE COURT: What about when the case is over? He's got to pay that single arbitrator how much an hour under Triple A?
>
> MR. LEON: If we're talking about the enforceability on the delegation clause as the first hurdle, we have to get past, the question as to whether or not additional fees would somehow be an impediment to arbitration, that's a question for the arbitrator. I think the first hurdle we need to get over if the Court were to find the delegation clause unenforceable, I don't think there's a predicate for finding that on this record at all. <u>And I will also make a representation to the Court. If the Triple A determines based upon an adequate showing from the plaintiffs that they cannot afford the cost of arbitration, we will front them.</u>

<u>Id.</u>

Coverall failed to follow through on that representation.  Although the AAA granted Reeves a hardship waiver, acknowledging that he could not afford arbitration's high costs, Coverall did not offer to cover Reeves' portion of the arbitrator's fees.  <u>See</u> Liss-Riordan Decl. at Ex. A.  Rather, Coverall continued to seek to apply the Commercial Rules, opposing Reeves' Motion to apply the lower-cost Employment Rules.  <u>Id.</u> at Ex. F.  The Arbitrator's eventual Ruling—that there was not sufficient evidence to warrant applying the AAA Employment Rules—left Reeves facing a fee he could not pay, and effectively ended the arbitration.  <u>Id.</u> at Ex. F.  While Coverall could have advanced Reeves' costs to "keep the arbitration alive", <u>see</u> <u>Cota</u>, 2021 WL

4864588 at *10, Coverall declined to do so.[13]  Because Coverall refused the opportunity to advance Reeves' fees to ensure that arbitration would continue, Coverall acted inconsistently with its right to arbitrate, let alone its representation to the court.

ii.    Prejudice to the Plaintiff

To determine that Coverall waived its right to arbitrate, the court must also consider whether Reeves was prejudiced by Coverall's actions.  See Stanley, 2018 WL 3872156 at *6.  Here, Reeves was plainly prejudiced, as he faced a delay in adjudicating his claims and lost his opportunity to arbitrate in the forum selected by the parties.  See, e.g., id. at *7 (finding prejudice where one party incurred "costs involved in submitting a doomed AAA demand for arbitration, in filing its district court complaint, and in defending a motion to compel"); SmartPay, 771 F. F.App'x at 933. Having acted inconsistent with its right to arbitrate by failing to advance payment, Coverall caused prejudice to Reeves, and thus it met both prongs of the test for waiver. See Stanley, 2018 WL 3872156 at *6. Because Coverall waived its right to arbitrate, it was "in default in proceeding" with the arbitration under Section 3 of the FAA. See Cota, 2021 WL 4864588 at *9; 9 U.S.C. § 3.

Section 3 mandates that the stay remain in place only until arbitration "has been had in accordance with the terms of [Reeves'] [A]greement" and "the applicant for the stay[, Coverall,] is . . . in default in proceeding with such arbitration." 9 U.S.C. § 3.  The court having determined that both conditions have been met, there is no basis for a stay of Reeves' claims remaining under Section 3 of the FAA.

---

[13] Coverall also appears to have failed to make its own $2,562.50 deposit. See Liss-Riordan Decl. at Ex. G.

3.      After Lifting the Stay

Having concluded that Section 3 of the FAA no longer authorizes or mandates a

stay of Reeves' claims, the court turns to the question of how to proceed.[14]

First, the Arbitrator issued no final award, but terminated the Arbitration before

reaching the merits of the dispute.  Thus, the court cannot rely on Sections 9 through 11

of the FAA, which instruct district courts to enforce, vacate, or modify arbitration awards.

See 9 U.S.C. §§ 9-11.  Furthermore, neither party has moved again to compel

arbitration and, even on such a Motion, the "district court can[not] force an independent

arbitration organization such as the AAA to ignore its own rules and re-open a case that

it has previously closed." Cota, 2021 WL 4864588 at *11.

Coverall urges the court to dismiss Reeves from the case for failure to comply

with the court's Order to Arbitrate under Federal Rule of Civil Procedure 41(b).  See

Def.'s Opp'n at 9,17.  However, here, as in Tillman, Coverall has failed to identify any

section of the FAA that would compel dismissal of Reeves' claims on the basis of his

inability to pay.  See 825 F.3d at 1075.[15] Thus, the court will not dismiss Reeves.

Finally, the plaintiffs ask the court to allow them to proceed with their claims in

court.  A district court has a duty to "adjudicate a controversy properly before it."  See

---

[14]  While Billie's claims are still being arbitrated, the court may exercise its discretion as to
whether to continue to stay Reeves' claims. See Guyden v. Aetna, Inc., 544 F.3d 376, 382 (2d Cir. 2008)
("[I]f some, but not all, of the claims in the case are arbitrable, [a court] must then decide whether to stay
the balance of the proceedings pending arbitration."). Because Billie's arbitration has no preclusive effect
on Reeves' claims, the court will not stay proceedings as to Reeves on the basis of Billie's ongoing
arbitration. See Billie Agreement at ¶ 21(A)(11) (Doc. No. 27-1).

[15] Furthermore, no Motion to Dismiss has been filed, and the parties have not had the opportunity
to brief such a Motion. The court recognizes that Rule 41(b) "gives district courts the authority to dismiss
cases,  . . . sua sponte, if a plaintiff fails to comply with court orders and/or fails to prosecute an action
pending in a district court." Shetiwy v. Midland Credit Mgmt., No. 12 Civ. 7068 (RJS), 2016 WL 4030488,
at *1 (S.D.N.Y. July 25, 2016), aff'd, 706 F. App'x 30 (2d Cir. 2017) (summary order). However, the court
will not dismiss Reeves sua sponte, as no basis for dismissal appears to exist.

Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., 673 F.3d 84, 100 (2d Cir. 2012) (citing Colorado River Water Conservation Dist. v. U.S., 424 U.S. 800, 813 (1976)).  Thus, given that no justification for a stay of Reeves' claims remains, and the dispute is before this court after arbitration "has been had", the court will lift the stay as to Reeves' claims and administratively reopen the case.  See Tillman 825 F.3d at 1076; Cota, 2021 WL 4864588 at *12 (denying the Defendant's Motion to Compel Arbitration because arbitration had "been had", then adjudicating the Defendant's Motion to Dismiss).

## V.    CONCLUSION

For the foregoing reasons, the plaintiffs' Motion to Lift the Stay (Doc. No. 54) is granted in part.  The court lifts the stay as to plaintiff Reeves' claims against Coverall.  Plaintiff Billie's claims will remain stayed pending the outcome of his arbitration before the AAA. The parties are ordered to confer and propose a Rule 26(f) Scheduling Order within 21 days of this Ruling.

**SO ORDERED.**

Dated at New Haven, Connecticut this 16th day of March, 2022.


  /s/ Janet C. Hall
Janet C. Hall
United States District Judge